Welcome to the United States Court of Appeals for the Fourth Circuit. We have two cases on for argument this morning. Before I begin, I want to recognize and thank our District Court colleague, Judge Patricia Giles from the Eastern District of Virginia, who has taken time away from her busy docket and other day job to join us here this morning. We're is 24-2051 Rockwell Mining, LLC v. Pocahontas Land, LLC. Mr. Lane. May it please the Court, I'm Tom Lane. I represent Pocahontas Land and with me is my partner, Gabe Wool. Pocahontas Land seeks a forfeiture in this case. We recognize that it is normally a difficult remedy. However, in this case, we have a tenant on the property that has violated the terms of the lease, has actually not played by the rules, and we submit that this is a proper case for forfeiture. Both sides in this case agree that forfeiture can be based on contract and in equity. The District Court in this case limited its ruling to the Bethlehem Steel case, which held that forfeiture is not available under contract unless the lease in question has certain technical requirements. It must have a forfeiture clause that provides for forfeiture and the terms for forfeiture must be expressed in the lease. The Court did not recognize a core limitation in the Bethlehem Steel case. A condition to the holding in Bethlehem Steel was that forfeiture is not available as long as there is an adequate remedy at law. In Bethlehem Steel, the owner of the property, the landlord, recovered over $10 million in monetary damages and terminated the co-lease that was an issue in that case. And that condition, that there was an adequate remedy, led to the decision that forfeiture would not apply. In this case A question about that. So in theory, assuming you could prove damages, couldn't you recover money damages for a breach of this lease? Your Honor, in this case the damage, the harm that was caused is the pocahontas. This is not a case about money damages. It's a case about the landlord, the owner of the property, having some control over who the tenant is. And that's an extremely important issue in this case where you have an extraction process that's ongoing on the property. Well, I understand that, but assuming that that lack of control somehow led to your client suffering monetary damages, you could recover for that, right? Your Honor, the actual monetary damages in this case probably would not be realized. Because there are no damages that you can prove. There are no monetary damages we can calculate. You're trying to extract a remedy that is not a match with respect to the breach that you're alleging, right? We're not seeking monetary damages, Your Honor. I know, because you have no damages. We haven't yet. In this case, we not only have an extraction going on, the tenant on this property has a mammoth surface mining operation on the property and associated with that surface mine. I'm sorry to interrupt you, Mr. Lane, but there's a lot about this contract that's very strange, including the fact that for whatever reason there's not an escalator clause that would increase the amount of royalties that your client would be entitled to. And I get that. That's bothersome and troublesome. But the reality is your client is still being paid the amounts that it is due under this lease, right? Yes? They are paying, yes, Your Honor. So what are the damages as a result of the reassignment of the lease? Your Honor, we assert that under West Virginia law, we don't have to prove damages. They are not necessary. Why is that? We have a whole line of cases in West Virginia that say that forfeiture is available in equity. And the reasons for it are, number one, in this case fits exactly the Warner v. Haught case that we have cited. In Warner v. Haught, the court said where a lessee repeatedly violates the terms of a lease, a lessor is entitled to forfeiture. And that's exactly what happened in this case. There were seven separate violations of the lease. Five deeds of trust and two changes in ownership. What were the nature of the violations in the case you just cited? In the Warner v. Haught case, the violations the court talked about were failing to pay rent when it came due. And the court said if the lessor has to assert a default, possibly go to court repeatedly to try to get paid the rent that's due under the lease, the lessor is then entitled to forfeit the lease. The other line of cases, the probably the most frequent injury that occurs are in oil and gas mineral cases where the finding is there's a failure to develop the property. And the court in almost every one of these cases holds that it's almost impossible to know in money damages how much might have been earned had they performed the core obligation they were supposed to perform. But that's not the issue here, right? It's not that they're not performing under the contract. That is correct. I'm just saying in the cases that allow a forfeiture, the facts are different in all of them. I'm just saying that in every one of these cases, monetary damages could not be ascertained. The problem here is with the forfeiture clause at issue because it is problematic. It's one of the general clauses. Correct. We do have provisions in the lease that do allow for forfeiture, correct? Correct. For those violations. These violations don't allow for it. And that's just per the contract. That's what was negotiated. So our second argument, obviously, is that it deals with the fairness of the contract and whether it was unconscionable. In this case, the one protection that the lessor or the owner has in this case is control of who its tenant is. Well, you know, you had a bankruptcy intervene in here in the case. Did you raise the argument that Article 16 expressly includes the transfer, transfers that occur by operation of law such as bankruptcy before the district court? Did you raise that issue? Your Honor, that issue was before the district court. There was a change in ownership that occurred in bankruptcy. And we think the district court finding on that was correct, that in bankruptcy, the prohibition against assignment does not apply and the bankruptcy court has the right to assign the asset. So didn't that gum up your argument? It came up to the argument. The Rockwell argues in this case that under the terms of this lease, if there's one change in ownership, it's one and done. It's all over with. And that simply is not the case. That is not what the provision provides. Doesn't it identify a control problem in this case? Control group and so by definition, it's limited to that set of persons and it doesn't have a life beyond that provision? It does say. In the 2015 amendment, it provides that if there's a change in control of 51% beyond the owners who own it at that time, it's prohibited. Well, those literal words still apply. In the bankruptcy court, bankruptcy court could assign the lease but it can't change the terms. Those terms still apply. You still can't assign this lease or have a change in ownership to those that didn't own it in 2015 at that time. So the literal prohibition still applies. And it was violated twice. Well, in that, well, kind of in that regard, have you identified any court opinion holding that a financing agreement with a savings clause cannot reach the anti-assignment or assignment consent provision? Neither side cites a case squarely addressing the savings clause that was in these leases. The literal terms of the savings clause in the deed of trust simply says the lenders will have no liability if there's a violation of the consent requirement. The literal terms of the savings clause do not negate the fact that this lease was assigned in the deed of trust to a trustee and the banks had authority in the event of default to sell the lease with no control by the owner of the property. None. And so the savings clauses simply did not negate the fact that there was a valid deed of trust that imposed a lien on the property and the banks could have sold this lease with no consent provision from the lessor. So I'm looking down the road just a second, not just to this case, but if we were to affirm the district court's holding as to the savings clause, would it impact West Virginia energy transactors including leaseholds that include savings clauses? Your Honor, I suppose Other. I'm talking about opening the floodgate type thing. I can say from experience, these issues come up frequently. Lessees need to borrow money periodically and they are considered in every instance and I can tell you, deeds of trust do get authorized. But in a case like this, there's no obligation by the lessor or the owner of the property to make a concession. Absolutely none. If they had come and asked for a concession, it would likely have opened up some negotiation. We missed an opportunity because in no instance they imposed five deeds of trust and not once did they come to the owner and say, we need your consent. Will you sit down with us and make a concession? Why didn't you do more negotiation back in 2015 when you did the amendment? The occasion in that instance was a sublease of a minor portion of the property. And in order to sublease it, they needed the consent of the owner. And so at that time, they were able to get an amendment to the lease that added to the prohibitions against assignment and added the prohibition there couldn't be a change in ownership without consent. So they did get some concession in 2015 and that's what it was. Well, if we were to find that the court didn't err in its analysis of unconscionability and termination, would we have to reach the related contract, reach the contract issues? I'm sorry, I didn't get the last part. I'm sorry, I'm talking too soft today. If we were to find that the district court did not err in its analysis of the unconscionability and termination, would we have to then consider the related breach of contract issues or we don't have to consider them? So if there were a finding of unconscionability, the remedy would be reformation of the contract and we would get to revisit the terms and at least try to make them fair. But if we held it the other way, do we have to reach the breach of contract issues? I believe so. I believe that the remedy of unconscionability is totally independent of the breaches of the lease that took place in this case. And while the contract, we believe, is fundamentally unfair, the forfeiture remedy is totally independent and it rests upon the repeated breaches of the contract. In what frame, in what time frame do we measure that? At the time the contract was entered into in 1937 or in today's world? Your Honor, two aspects of unconscionability, procedural and substantive. Procedural of necessity has to be measured when the contract was entered in 1937. Substantive, I think the West Virginia law is not entirely clear on whether it's evaluated in 1937 or whether you can test it today. And frankly, we have dicta. Rockwell has cited two cases that suggest you have to analyze it in 1937 when it was entered into. It also cites the E.F. Ola case. And in the E.F. Ola case, the court held that a rent paid today might become unfair in the future. But the problem with that is that you could be shifting. At one moment it could be conscionable and then the next moment, unconscionable. So that's the problem if the timing shifts. I have to agree with that. You're correct. And my answer is, in this case, we believe the contract was substantively unconscionable in 1937, not just due to the flat rate rent. It was the combination of a flat rate rent, a perpetual renewal and no re-opener. So we're 90 years after the fact and there's never been a chance to adjust the terms of the lease. The experts in this case could But there was a time, in 2015, because didn't you look at it then? I can't speak to the negotiations that took place in 2015. They did exact a concession. But you're correct, Your Honor. When they sat down and negotiated, they did not increase the royalty rate. And it was probably just as bad then as it is today. Well, you can't tell from the record, but it seems to me that what happened in 1937 was a common practice with railroads, coal folks, the whole deal. You can't tell how much incest there is in all these parties. How many were the smaller party who agreed to do something in connection with that? What was the interconnections? Were they just strangers or were they incestuous? Well, Your Honor, we took a deep dive in the history of this case. And we hired experts. We did research on what the circumstances were in 1937. And the clear facts are that Andrew Mellon owned a significant interest in the lessor. He owned the lessee. And more than that, he owned the railroad. And he had a vertical integration where he had everything from ownership of the coal in the ground to the mining company to the shipping company. And the facts indicate that one of the most important considerations wasn't the royalty income, the income from the mining. It was the profits they were going to generate from shipping the coal. And in our estimation, when you start and look at a contract that is substantively unconscionable and you have to ask yourself, what happened? How did these parties reach disagreement? And the simple answer is Andrew Mellon interests were on both sides. They were on the lessor side, the lessee side. They not only owned a significant interest, but there was common management. So you had management on both sides of the issue. Well, does that in and of itself make this an unconscionable contract? All it does is show that at the formation of the contract, this contract was not an arms length negotiation between parties having different interests. And the only issue that we raise on this appeal is that in this case, we don't have to prove direct coercion. All we have to prove is that there was some slight procedural irregularity. And in this case, the common ownership, the dominance of the Andrew Mellon interests clearly indicate that this was not an arms length negotiation. And the error that we suggest was in making a decision here on summary judgment. This did not go to the trier of the fact. And we think there is an issue of fact. But we're not dealing with a man's decision. We're dealing with sophisticated companies. And so you'd have to overcome that sophistication, wouldn't you? We agree. The Andrew Mellon interests were sophisticated. There is no question. I mean, they even had congressional hearings on this general matter at the time. So yes, we agree, Your Honor, they were sophisticated. But the common overlapping ownership and management clearly indicates this was not an arms length negotiation. And it resulted in a contract that is fundamentally unfair. And as time goes on, it becomes increasingly unfair. Well, as to your procedural and substantive argument, I mean, obviously, there's a sliding scale in that regard. Where is your, where is the, you know, where is the, you know, the procedural defect in 1937 on that scale? It seemed to me that it was, it was further down the road than you want it to be. All we can do is, we have done extensive research to uncover as many facts as we could. And what we did find is there was significant influence about one person on both sides of this equation. Mr. Lane, you mentioned that Andrew Mellon was primarily interested in garnering the profits from the transportation of the coal, is that what you said? That's what was revealed in congressional hearings. But that's not necessarily inconsistent with an opportunity to negotiate the royalty rates related to the lease. Those are two separate profit streams. Your Honor, one of the things that the courts look to in these unconscionability cases is where you have a vertical integration and you have self-dealing among all the different companies. And that's, that's all we're showing here is there, these companies were all interrelated. They, they were not disparate entities. They, they were, you have one of them. Yeah, but you've got to show that Loop Creek didn't have a meaningful ability to negotiate a reasonable royalty stream. And if the argument is that one party was primarily interested in a different income stream, I don't see how that connects to the inability of the other party to say in exchange for that income stream I want a higher, either a higher royalty rate or an escalator clause or some ability to terminate the lease depending on market forces. Those would have been normal terms. I mean, the experts in this case have all indicated there aren't any leases like this out there anymore. I've been involved in this lease since 1987 and it is an outlier. And the reason is your common terms would not have a perpetual royalty or they would at least have some re-opener provision in it. And it's the combination. I mean, we can't argue that 10 cents a ton was not a traditional royalty in 1937. But combined with perpetual renewal and no re-opener clause makes it fundamentally unfair. And you just don't see leases like that. This is an outlier. All right. Thank you, Mr. Lane. Thank you. Mr. Glasser. Thank you, Your Honor. Let me just take a second to get organized here. Okay. May it please the court, I'm really happy to be here today in what is essentially the West Virginia courtroom. I have three West Virginia judges who I knew and worked for, one of them behind me, so that's fun. And I've been colleagues with Tom for 30 years in the law and he's a good friend of mine. So it's nice to be up here with him to talk about this case. Let me just go through some of the questions the court asked and answer them from our perspective. So the first question that was asked was about the Warner v. Hott case. And the Warner v. Hott case was a failure to pay the rent case, which is obviously the core, it's the core thing in a lease. I'm going to give you the property and you're going to pay me money for it. And in Warner v. Hott, they repeatedly failed to pay the rent, but did in fact ultimately cure and still forfeiture was denied in the Warner v. Hott case. That was one of the first questions that the court asked. Let me go to the second. Second, the court asked about abandonment cases. And to me, the line of abandonment cases is consistent with the idea that to get equitable forfeiture, you have to have something that can't be cured by money damages, which is something you asked about, Judge Diaz. And that's because abandonment of the lease, never developing an oil and gas lease, goes to the core of the bargain. I gave you an oil and gas lease. You promised to put some oil wells on it. You never put any oil wells on it. That core abandonment never exploits the mineral, which is the essence of a mineral lease contract. So that is a normal forfeiture case, when you just totally abandon. And as you pointed out, Judge Giles, there's no abandonment here. We have been working this lease, paying the royalties, mining the coal. Now, my colleague, Tom Lane, before he sat down, he talked about this conjunction idea, that the conjunction of two legal things, a conscionable lease that was normal, you know, he just told the court that the royalty rate was totally normal in 1937, and this renewal clause that somehow the conjunction of two legal things could make a forfeiture, could make an unconscionable lease. And that doesn't make any sense to me from a legal perspective. If the lease is conscionable at the time it was made, procedurally and substantively, and as must be conceded, West Virginia law allows renewal of mineral leases so long as the mineral is being exploited, which is totally common, and has been approved by court after court, how can two legal things cause a rescission of the lease? Those are two separate principles, though, right? You've got a lease here that has a fixed royalty rate as of 1937, and a perpetual provision, it's not really in perpetuity, I guess, until the minerals no longer exist. It's those two combinations that we have to ask, consider whether or not that combination of things makes the lease unconscionable. So it seems, I mean, it just seems like a terrible deal. It's definitely turned out not to be a great deal because it lasted so long for them. I'm sure it was a great deal in 1937. The evidence in the record is they paid $3 million for the property. We know they've been getting at least $100,000 a year, even if there was no mining for 88 years, so they've gotten back $8.8 million. Evidence in the record that they're paying more for the maintenance and expenses of upkeep of the property than, and of course that's not determinative because I guess bad deals, that's the benefit of the bargain sometimes, but it just seems odd that you wouldn't have some basis to try to level the playing field, and maybe that's not the test. So courts have never put themselves in the position of being roving commissions about changing contract terms because somebody makes a bad deal. And that's why I think courts adhere, and West Virginia adheres. So West Virginia says substantive unconscionability is the time of making of the contract. And the cases I would cite for that are the Lange case, which was a 2002 case, and the Troy Mineral case, which was a 1986 case, both of which post-state the case my colleague cited, which was IAFOLA. And they adopt restatement of contract section 208, which clearly says conscionability is at the time of the making of the contract. And frankly, the UCC, the Uniform Commercial Code in West Virginia, and the actual site is in our brief, says textually in the statute you judge conscionability at the time of making the statute, and the West Virginia Consumer Code textually in the statute says the exact same thing. So what they're up here arguing for is actually a very special carve-out for, I guess, mineral leases, because if it's a contract for the sale of goods, there's a statute that says you judge it at the time of making only. If it's a consumer contract, no matter how adhesive or terrible, there's a statute in West Virginia that says you judge it at the time of making only. And there are two cases, Lange and Troy Mineral, that adopt the restatement second of contract section 208, and the restatement in those cases say you judge substantive unconscionability only at the time of making. So I think even though there may be a bad deal for them ultimately because of how long it has lasted, although I'm sure they were deeply in the money in 1937, and they were more worried about prices going down than up because it was a depression, and maybe that's why they fixed the royalty rate, certainly over time that royalty is low now, no question about it, but that's why the court, the law is you judge it at the time the party's bargained. So that's my position on that one. Now, on the renewal, there are two West Virginia cases, Iafola versus Douglas, a 1978 case, and Pechonok versus Baltimore, Ohio, a case around the same vintage in the 80s, but cites cases back to the 19th century. And all of them say renewal is normal. If the court goes out and searches, just as a Wessel search on the paying quantities, you'll find that most oil and gas leases, when you drill it, so long as it's being produced in paying quantities, that lease is renewed and maintained and stays. So that's super common. And if you do a Wessel search for the concept of mineable and merchantable coal, you will find that most coal leases are renewable so long as mineable and merchantable coal is being mined and exploited. These are super common provisions in mineral leases, and the idea makes sense. But wouldn't those cases affirm a lease that also has a fixed rate that's never, can't ever be negotiated? There is not a conjunction of cases that affirmed lease renewal as is normal for leases and a ten-cent royalty, nor is there one going the other way. This exact circumstance has not been before a court. But I think you've got to fall back on, you've got to judge it at the time the contract is made, because that's the law. And both of the things they're citing, if it's a conscionable lease at the time it's made, procedurally and substantively, then it's legal. And because normal renewal during paying quantities or mineable and merchantable coal is well-established law in all mineral states, definitely in West Virginia, two legal things can't destroy your lease, or ought not destroy your lease, is I guess how I'd put it. Your colleague on the other side makes an argument that the district court erred by not considering at all the second part of that equation with respect to unconscionability because it found no procedural unconscionability. And they turned, they looked to the fact that Andrew Mellon seemed to be calling all the shots back then, which is probably true. I don't know. And they point to this integration, the overlapping interests, and that should have been enough to get them over the bar with respect to procedural unconscionability. What's your response to that? So if you delve into the actual export reports, I think you'll find there were 5 million children each with 20 percent of the Mellon interest. And there's no discussion in the export reports about whether the 5 got along. The court, in his opinion, didn't get into that because the total Mellon interest on the lessor side was 40 percent of the voting stock. And so the court said, fine, the Mellon family interest, which was actually 5 children, we don't know if they got along with each other or not, was 40 percent of the voting stock over there. That's not enough for control. In total? Yes, in total. The 5 in total had 40 percent of the less, of the parent, ultimate parent, like 3 levels up of the lessor. But when you delve down into this, and there is absolutely no record evidence of common management. If you look at the lease itself, which is JA97, and thereafter you will see it's signed by two separate parties. There was a loops president and there was a coppers president, two separate people. There is no record evidence, my colleague said common management. There's no record evidence in this case of common management whatsoever. There is simply a lease that isn't even a parent subsidiary relationship. There's no, you know, the lessor didn't know how to respond to that argument that there was no indication of there being separate representation of counsel. Yeah, so we go into that and The district court seemed to assume it. Well, there's a stamp on the bottom of the last page of the lease underneath the signature of the one party that the court tagged for that, that has a seal that you can't read anymore that says approved as the legal form and has a signature. So the court saw that as evidence there was at least one lawyer involved. But whether or not that lawyer represented both sides, we don't know. Right, we don't know. But I will say that West Virginia law is clear, and this is the Black Rock Capital case, that even a 100% parent subsidiary relationship does not make a per se procedural unconscionability if they have a contract between them. And what my colleague is essentially asking for here is a per se rule that when there's some overlapping ownership there's procedural unconscionability and that's enough to get you over that hurdle and get to the second, well they actually argue about whether it's a two-factor test or not, but they think that's enough and I don't think this court should go there. Now let me talk about the 2015 consent which you raised, Judge Floyd. I think the best textual argument on that one is that you have to give meaning to the idea of the 2015 control group. It was Mitch Potter and his entities. And yes, it was wiped out in the 2019 bankruptcy. Definitely wiped out, 100% wiped out. So it can't ever be transferred away from them again. So it's over. And that's the only way to give meaning to that sentence. Otherwise you could have just written it to say any transfer of 50.1% requires our consent. But that's not what it says. It says any transfer away from this particular group. And I think the district court, you know, yes, it, everyone agrees that the bankruptcy didn't give them the right to consent and the transfer happened and it wiped out the group. But it wiped out the group nonetheless with an assignment and it can't ever happen again. So I just think we have the right textual argument. And this kind of goes to harm. We didn't have a frivolous argument that we didn't need their consent. That's what, I mean, we had a declaratory judgment action about whether or not that clause was still effective to require a consent or not. And our argument was non-frivolous. It was in a declaratory judgment action. We, you know, we didn't just willfully disregard it. We have a good argument that it's just not so. So I'll save the remainder of my time. Thank you. Thank you very much, Mr. Glasser. Your Honor, I can tell by the questioning that the court is having a difficult time with our forfeiture argument. I'd like to emphasize that in West Virginia we have a whole line of cases that indicate that where there is indifference, frequent violations of a contract, where there's injustice, where there's fraud, where there's a whole litany of things that justify equity jurisprudence and there's no adequate remedy at law, equity entitles an owner like Pocahontas Land to get a forfeiture. It's the only relief that is meaningful that we can get in this case. I would like to read what the West Virginia court says, partly in relation to the Bethlehem Steel case, which is what the district court limited its decision on on forfeiture. Bethlehem Steel was limited to a finding that there was an adequate remedy at law. And here's what the West Virginia court says about that. The phrase adequate remedy at law is often misinterpreted. The controlling question is not, does the party have a remedy? But is the remedy fully commensurate with the necessities of the parties? The court goes on, to defeat equitable cognizance, the legal remedy must be full. It must be complete. It must be adequate. If it does not actually compel the performance of a duty, it cannot be said to be fully adequate. Again, the court says, to deny equity jurisprudence because of a remedy at law, the legal remedy must be as complete and efficacious as the equitable remedy. So in this case, the relief Pocahontas Land got was $1. Nominal damages. Clearly, that was not as efficacious as the legal remedy. It did not compel performance of the obligations in this case. It simply does not meet the requirements of the West Virginia court. Before you run out of time, I want to go back to one more question about procedural unconscionability. Are there any factors beyond the shared ownership in Loop Creek and Copper Coal that support a finding of procedural unconscionability? And I'm asking that question because if you can't get beyond that, I don't see how you can win. We recognize, Your Honor, you are correct. West Virginia requires both procedural and substantive. We've got a strenuous dissent that we ought to get away from that. I'm not arguing it's right. I'm just arguing that that's wrong. We agree, Your Honor. We have to show some procedural unconscionability. We believe these facts demonstrate that the surrounding circumstances when they entered into this contract, we can't prove that there was actual coercion. I mean, obviously, there's no witness left that can really tell us exactly what happened. All we can do is sit here today and look at a contract that is fundamentally unfair to us. We think it was unfair when it was entered. So we look at these facts and think, well, what was the procedure? What happened? And we see, we agree, 40% control by the Andrew Mellon interest, but they owned 100% of the common stock. They just had 40% of the voting control. But we submit that, and shareholder suits indicate all the time, you don't have to have a majority. You don't have to own it all. Sometimes the minority has a very strong influence in the outcome. And we think that when you combine this overlapping ownership and the circumstances with the fact that you had an unfair contract, to us, it leads to a conclusion that at least there was some slight procedural unconscionability here that would justify a finding of an unconscionable  contract. Is your argument also that the royalty rate in 1937 was unreasonable? We cannot argue that. In 1937, you did see rates like that. But what you did not see was the combination of the ability to renew indefinitely into the future with no re-opener. And the end result of that is clear. You don't have leases like that anymore. They just don't exist because they are fundamentally unfair. So in conclusion, on the unconscionability, the party, both parties, did extensive research. But it is clear from all the evidence that the surrounding circumstances, in our opinion, at least indicate there was a genuine question of fact on the procedural aspects of how they entered into this contract. Thank you very much. Thank you for having me back. I'll just address a couple of things that just came up. The first is there's no need to remand for more. My colleague just said we have no other evidence of what happened. There's no live witnesses. There's nothing new that could be found about procedural unconscionability at a trial on the matter. There's 40 percent of the voting stock held in the parent, but there's no other witness or evidence they bring to talk about any other procedural unconscionability. I think we just heard that. And then the second thing we heard right at the beginning of the argument was about willful indifference. And I think I addressed why it shouldn't be regarded that we've acted with willful indifference on the 2015 consent issue, at least that we had a good argument that it didn't continue to apply. We also met the requirement. You've got to remember at the bottom of the 2015 consent it says consent cannot be withheld. So even if it did apply, it can't be withheld if the person coming in has reasonable coal mining experience and reasonable financial standing. And the court in assessing damages looked at that and said, and this is at pages 44 through 51 of its opinion, it's very clear the court said, well, you kept the same employees for four years, 196 years of coal mining experience in the management at the coal mine, so they have reasonable experience, and you put up more than $100 million in the property and paid off the debt, so you have reasonable financial standing. So there's not a harm there. There's not a harm there is what the court said. Even if there's a breach, there's not a harm. You're better off than you were before. And then on the deed of trust savings clause instrument, I think you got to this, Judge Floyd, in your discussion. These are the facts on that. Those are commonly used instruments, legal instruments. In the same counties we're talking about, we put before the district court the $7.7 billion worth of transactions away from us, depends on them, and they covered like 1,200 leases. Our own savings clauses in this case covered more than 1,000 leases. And so they noticed the fault that we didn't get their consent, taking the odd position. Normally a lessor would say, okay, the savings clause works. It doesn't put a lien on my property. But they take the opposite position, that it puts a lien on their property. We promptly sued for declaratory judgment that we didn't breach, so we weren't ignoring the problem. We promptly went to court to get it resolved. And it was a case of first impression in West Virginia. And when the court ruled against us within 12 days, all the lenders, all the trustees under these complicated bond indentures got their act together, went down and filed a confirmatory supplement that disclaimed any right in this lease. So, you know, so the court said on those pages 44 to 51, what articulable harm came from this? They can't point to any transaction they tried to do that got interfered with. Nobody may have ever even noticed, except for the court that we were in front of, having this argument. And a declaratory judgment is the right way to deal with these issues. So we weren't just ignoring them or not caring about their rights. We went to court to resolve two close issues of, you know, interpretation. So that's my view of that. All right. Thank you very much. Thank you. I want to thank both counsel for their excellent arguments this morning. Out of respect and as an accommodation for my colleague, Judge Floyd, we'd like all the lawyers at the council table to come up so that we can greet you. And then we'll move on to our second case.
judges: Albert Diaz, Henry F. Floyd, Patricia Tolliver Giles